# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID AND MARTINE MEDNANSKY, | CASE NO. 09cv1478-LAB (CAB) |
| Plaintiffs, | **ORDER DISMISSING COMPLAINT; AND** |
| vs. | |
| U.S.D.A. FOREST SERVICE EMPLOYEES WILLIAM METZ, OWEN C. MARTIN, RANDY MOORE, RITU AHUJA, MARLENE FINLEY, AND DONNA GROSZ, | **ORDER RE: AMENDMENT OF COMPLAINT** |
| Defendants. | |

On July 8, 2009, Plaintiffs filed their complaint seeking relief for perceived violations of their constitutional rights under *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971).  Defendants moved to dismiss on the basis of qualified immunity and for failure to state a claim.

The Mednanskys and employees of the U.S. Forest Service were parties to an earlier and somewhat related action for alleged civil rights violations, *Mednansky v. Gillett*, 07cv1425-LAB (CAB), which was dismissed on the merits and is now final.  The United States' related ejectment action against the Mednanskys, *United States of America v. Mednansky*, 10cv1307-LAB (BGS) is now pending.

/ / /

**I.      Factual Background**

Except as noted, the factual background is taken from the complaint.   The Mednanskys reside in a cabin in the Cleveland National Forest, under a permit from the U.S. Forest Service.   Defendants are employees of the U.S. Forest Service, and actions they took in the course of their official duties are alleged to be the basis for Plaintiffs' claims.   The Mednanskys acquired their permit and bought the cabin in 1999.

The Mednanskys are engaged in a dispute with the Forest Service over conditions on their property.   On November 20, 2008, Ranger Owen Martin sent a notice of noncompliance telling the Mednanskys they needed to obtain a new recreation residence permit.   It identified various violations of the special use permit's terms and conditions, specifically:

        1.      An unauthorized rock wall on each side of the cabin

        2.      A vehicle stored next to the garage

        3.      An unauthorized outhouse

        4.      Unauthorized construction of footings, filled with cement and rebar

        5.      An unauthorized shed

        6.      A rope or chain improperly attached to trees.

The letter says the first four violations had been identified during the previous year's inspections.   It directs the Mednanskys to correct all the conditions and call to initiate a reinspection.  Assuming all identified violations were corrected, the letter says a new 20 year recreation residence special use permit would be issued.   The letter also told the Mednanskys, if they could not meet the deadline but were working in good faith to comply, that they could be issued a one-year permit provided they submitted a compliance plan.

The Mednanskys did not directly dispute any of the identified violations until June 2, 2009, when Mr. Mednansky sent Metz a letter.  Among other subjects, the letter disputed some of the violations as follows:

/ / /

/ / /

1       1.      The stacked rock is not a wall.  It is building material for an addition
2               they had asked permission to build.  They stacked it to prevent it from
                deteriorating.  Rich Tobin (a Forest Service official) knows why they
3               stacked the rock, and also why sand and gravel were delivered to the
                Mednanskys' lot, and authorized them to stack it.

4       2.      He does park a vehicle next to his garage, but uses it on a regular
5               basis.

6       3.      He built the shed to replace an old shed from the 1920s that
                deteriorated.  He put the new shed over his well and away from the
7               propane tank and built it so it would be fireproof.

8       4.      The rope chain was already attached to the tree when the
                Mednanskys bought the cabin in 1999.  It apparently had been
9               attached to the tree for some time.  Mr. Mednansky is using the chain
                to gradually correct the growth of the lopsided tree, so it would not
10              have to be cut down.  He thinks his method of saving the tree is
                working.

11  The letter also includes a somewhat disjointed explanation about the footings:

12          The so called footings that are alleged to not have been authorized is not
13          under construction.  However Susan DeSonia had indicated to my wife that
            construction was authorized.  Therefore since no work is being performed
14          this non-compliance allegation is without merit and appears as a
            contradiction.

15  Apparently what he means is that no one is performing any work on the footings, so they are

16  not under construction; but even if they were, the construction would be authorized.  The

17  letter also said the alleged violations had existed since at least 2004 but no complaint was

18  made earlier.

19          Shortly after that, Mr. Mednansky sent Martin an email disputing each of the identified

20  violations, in some cases somewhat differently than in his letter to Metz:

21      1.      The "rock wall" is in fact construction material stacked next to his
                house.  He says he brought it onto the lot for the purpose of fire
22              protection.

23      2.      There is no vehicle stored by the garage.  There is a vehicle regularly
                parked next to the garage, but it is one he regularly uses.  Also, the
24              permit does not say he cannot store a vehicle in his yard.

25      3.      There is no reason for him to remove the outhouse, because it was
                built under the terms of his permit.  He alternatively argues it is "part
26              of a historic set of buildings on the lot" and "has intrinsic historical
                value as well as associated monetary value . . . ."  He also says the
27              outhouse was "properly deactivated many years ago. . . ."

28  / / /

4.      There is no unauthorized construction activity taking place on his property, and he does not know why the Forest Service thinks there is.

5.      The shed houses plumbing, a pressure tank, and an electrical system for his well, and also serves as a storage area.  He admits the new shed was constructed without authorization, but because it was built to replace an existing shed that had fallen into disrepair, he believes no special authorization was needed.

6.      The "rope chain" is a temporary measure for the purpose of straightening the tree, which was leaning within a few feet of the cabin's chimney and posing a fire hazard.  It was attached to the tree when the Mednanskys bought the house in 1999.  His plan is to ratchet the tree back to an upright position over time.  Periodically he plans to tighten the chain, slightly cracking the base of the tree, and then permit the tree to recover before tightening the chain again.  He believes he is authorized to care for the land his cabin is located on, and this is his method of saving the tree.

The Mednanskys also engaged in correspondence with Defendant Metz.  On January 13, 2009, Metz wrote them, telling them of some problems with the permit renewal procedures causing delays in renewing permits, and assuring them their old permit would be extended until the problems were ironed out.  This letter, which is addressed "Dear Recreation Residence Permit Holders," is referred to in the complaint, and attached as an exhibit to the motion to dismiss.  The Mednanskys allege they took this as confirmation they would be given a 20-year permit.

On March 9, Metz emailed the Mednanskys, telling them he was "not aware of anything involving plaintiffs' recreation residence and FS." (Complaint at 2:27–3:1.) On May 22, 2009, Metz sent the Mednanskys a letter concerning appraisal values and proposed modifications to the wording of the new 20-year permit.  On May 25, Mr. Mednansky emailed Metz in reply, arguing the new proposed terms were unreasonable, requesting certain information about his lot, and claiming the U.S. government had no authority to issue regulations governing use of land in national forests.  The essence of his appeal to the Constitution in this email is the Takings Clause: he argues that including new terms in new permit agreements amounts to a taking, since owners of buildings are forced to agree to the changes in order to keep their property.

/ / /

On June 1, Metz sent the Mednanskys a letter telling them they had to bring their lot into compliance or their permit, which had expired December 31, 2008, would not be renewed. The letter mentioned the letter of November 20, 2008 and cited the Mednanskys' refusal to engage in the process identified in the letter. Because the Mednanskys were living on the lot without a valid permit, the letter notified them they were in trespass, and warned them the buildings would be removed. The letter also offered the Mednanskys a short duration special permit while they brought the lot into compliance, and informed them how to obtain such a permit. The letter also told them they had until June 11 to request the permit or the offer would expire.

Mr. Mednansky responded with a letter on June 2. In part the letter disputed the findings of violations, as discussed above. It expressed the Mednanskys' refusal to communicate to Forest Service employees of the Descanso Ranger district and chided Metz for sending his email the day before. The letter said Ms. Mednansky was in a fragile mental state and the email had upset her. The letter also alleged that the email was sent in retaliation for their criticism of the appraisal process. The letter also discussed an incident on June 9, 2004 involving Forest Service employees and later behavior by Susan DeSonia which was the subject of litigation in *Mednansky v. Gillett*, and alleged this showed the Forest Service was acting out of revenge and hatred.

On June 8, Mr. Mednansky emailed Martin. In addition to disputing the identified violations, as discussed above, the email requested an extension of the permit and asked for more information about the identified violations.

On June 19, Martin sent the Mednanskys a letter telling them they had to submit a plan for curing or correcting violations no later than September 30, 2009. In particular, the letter said:

> 1. You must remove from NFS land all the rocks you have stored, whether as a pile or a wall, on the north and south sides of your recreation residence. Your storage of building materials onsite amounts to an unauthorized construction of improvements and/or an unauthorized commencement of construction activities, as prohibited by Section III., Clauses A and B of your former permit.

2.      You must remove any inoperable vehicles and/or vehicles with expired registration decals from the lot.  Any vehicles kept on the lot must be legally registered with the State and have current registration decals. Please submit copies of your current vehicle registration for any vehicle you intend to keep at the lot as part of your Plan.  If a vehicle with current registration is being repaired at the lot, this vehicle must be removed and repaired off of NFS lands.  Any vehicle being kept at the lot must have proof of current registration and should be stored in the garage.  (R5 Supplement, Section 41.23f(6)).

3.      You must remove from NFS land the new shed located between the recreation residence and garage that was recently constructed without prior approval from the Forest Service.  This construction was a violation of your former permit, which clearly prohibited any "**development, layout, construction, reconstruction or alteration of improvements** on the lot," without first submitting plans to the authorized officer for approval.  "**Such plans must be approved by the authorized officer before the commencement of any work**." (Special Use Permit, Section III, Clause B).

4.      You must indicate in your Plan whether you intend to maintain either the garage or the former outhouse, located on the north side of the recreation residence, between the residence and the garage, as an out-building.  Since your outhouse is no longer being used as an outhouse, it must comply with your former permit, which authorized only one recreation residence and one out-building.  Thus, under any new short duration permit, only your main recreation residence and a single out-building would be permitted to be retained.  As it is not attached to the main dwelling, the garage is considered part of the recreation residence only if it is actually being used for vehicle storage. If you are using your garage for purposes other than storing your vehicle, it qualifies as an out-building and will count toward the one out-building limit.  Therefore, if you intend to maintain the garage for purposes other than vehicle storage, you must remove the former outhouse as it exceeds the one out-building limit.  Your proposed Plan must indicate which of these out-buildings you intend to retain, and must provide for the removal of all other out-buildings.   (R5 Supplement, Section 41.23g(2)(f)).

5.      You must cease and desist all unauthorized construction of the cement and rebar footings adjacent to your recreation residence.  These footings must be removed; the site restored to its natural state, and the site condition must be approved by the Forest Service prior to this noncompliance issue[ ] being cured.  (Special Use Permit, Section III., Clause A and Clause B).

6.      You must remove the rope/chain from the tree located on the north side of the recreation residence.  This action girdles the tree and will ultimately kill the tree.  (Special Use Permit, Section IV, Clauses B and D).

(Emphasis in original).  The letter said if an acceptable plan was not received, the request

for a short duration special permit would be denied, and as a result the Mednansky would

no longer be permitted to occupy the lot.  The Mednanskys interpret this letter as a threat to remove them from their residence.  They argue that Martin was making new demands and creating new rules "on the fly," and that this letter was sent in retaliation for their June 8 letter.  (Complaint, 16:19–21.)

The building materials had been sitting on the site for ten years and the Mednanskys say that they had requested authorization for construction, but it had never been granted. (Complaint, 16:22–28.)  They argue, without providing any detail, that they "saw other similarly situated permittees get authorizations to build additions to their residences." (*Id.*, 16:27–28.)

Except for Metz and Martin, no Defendant communicated with the Mednanskys.  The Mednanskys argue the other named Defendants are liable because they failed to do anything about Metz's and Martin's alleged violation of their rights.

## II.    Legal Standards

A motion to dismiss tests the legal sufficiency of the claim.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  When determining whether a complaint states a claim, the Court accepts  all allegations of material fact in the complaint as true and construes them in the light most favorable to the non-moving party. *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007) (citation omitted).  However, the Court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint," and does "not . . . necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citations and quotation marks omitted).

A court may also consider evidence on which the complaint "necessarily relies" if: the complaint refers to the document,  the document is central to the plaintiff's claim, and no party questions its authenticity. *See Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994), *overruled on other grounds by Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Warren*, 328 F.3d at 1141 n.5.  The court may treat such a document as

1    "part of the complaint, and thus may assume that its contents are true for purposes of a

2    motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.

3    2003)."  The Court therefore assumes the January 13 letter Defendants attached to their

4    motion to dismiss is authentic, and of course assumes the documents the Mednanskys

5    attached to their complaint are likewise authentic.

6         Defendants have raised the defense of qualified immunity.  "The doctrine of qualified

7    immunity protects government officials from liability for civil damages insofar as their conduct

8    does not violate clearly established statutory or constitutional rights of which a reasonable

9    person would have known." *Pearson v. Callahan*, 129 S.Ct. 808, 815 (2009) (citation and

10   internal quotation marks omitted).  Government officials performing discretionary functions

11   are entitled to qualified immunity if there was no constitutional violation, or if the violated right

12   was not clearly established.  *Id*. at 818.  "The qualified immunity standard gives ample room

13   for mistaken judgments by protecting all but the plainly incompetent or those who knowingly

14   violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal citation and quotation

15   omitted).  A government officer is entitled to qualified immunity so long as "a reasonable

16   officer could have believed, in light of the clearly established law, that his conduct was

17   lawful." *Saucier v. Katz*, 533 U.S. 194, 194 (2001).

18        The immunity is "*immunity from suit* rather than a mere defense to liability," *Mitchell*

19   *v. Forsyth*, 472 U.S. 511, 526 (1985), and as such should be decided at the earliest possible

20   stage of litigation. *Saucier*, 533 U.S. at 200–01.

21        While the Mednanskys are now represented by counsel, they were proceeding *pro*

22   *se* at the time the motion was briefed.  The Court therefore construes their pleadings

23   liberally.  *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  The Court's construction does not,

24   however, supply elements of the claim that were not initially pled.  *Ivey v. Bd. of Regents of*

25   *the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982).  Ordinarily if a *pro se* complaint is

26   dismissed, the plaintiffs will be given leave to amend, but the Court may dismiss without

27   leave to amend if it is absolutely clear the complaint's deficiencies could not be cured by

28   amendment.  *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2007).

Defendants were all federal officials acting within the scope of their duties, and a *Bivens* action is the only apparent theory under which the Mednanskys can seek relief on these facts.

**III.     Discussion**

The Mednanskys argue Defendants violated their First, Fifth, and Ninth Amendment rights.   The First Amendment claim is based on a retaliation theory: The Mednanskys contend Martin and Metz made threats against them solely because they spoke out, challenging and criticizing Metz's decisions and actions.   The Mednanskys argue their actions have been above reproach and there is no reason, other than retaliation, that Metz and Martin would threaten to refuse to renew their permit.

The complaint says the Fifth Amendment claim is based on an equal protection theory, but in substance it is primarily a due process claim based on the theory that Defendants would not give them a fair hearing or reasonably resolve their disputes.   The only potential equal protection element arises from conclusory and passing allegations that other permittees were treated better.

The complaint also raises a Ninth Amendment claim based on the theory that Defendants exceeded the powers granted to them under the Constitution.   The acts alleged to exceed Defendants' powers, however, are better characterized as due process and equal protection violations.

**A.     First Amendment Retaliation Claims**

To demonstrate retaliation in violation of the First Amendment, the Mednanskys must plead and prove first that Defendants took action that would chill or silence a person of ordinary firmness from future First Amendment activities, and second that Defendants' desire to cause the chilling effect was a but-for cause of Defendants' action. *Skoog v. County of Clackamas*, 469 F.3d 1221, 1231–32 (9th Cir. 2006).   Defendants argue their alleged actions would not create a chilling effect, and the Court agrees.

The Mednanskys have alleged Metz and Martin retaliated against them because of what they said in their June 2 letter to Metz.   They allege Metz and Martin retaliated against

them beginning June 19, 2009, by sending letters threatening to deny them a permit, which would result in them losing their cabin. But this is an unreasonable and exaggerated reading of the letters. In fact, the letters only required the Mednanskys to submit a plan showing they would take steps to remove the outhouse, shed, footings, piles of rock, and rope or chain, and to submit documentation that their vehicle was properly registered. The only real threat was that if they failed to do these things, their already-expired permit would not be renewed. The end result would be that the Mednanskys might lose their cabin, but only if they didn't comply with the letter's directions. In other words, neither Martin nor Metz threatened to take away the Mednanskys' cabin; rather, they "threatened" to require the Mednanskys to submit a modest amount of paperwork. If they submitted the paperwork, the permit would be renewed and the cabin would not be lost  The Court holds this would not chill a person of ordinary firmness and therefore the Mednanskys have no First Amendment *Bivens* claim. The letters' remarks that the Mednanskys were in trespass was not an unlawful threat or accusation. Rather, because the permit had expired and no new permit had been issued, it was a truthful statement. In context, it is apparent Martin and Metz were giving the Mednanskys legal notice they were in trespass.

Furthermore, Martin's letter of November 30, 2008 identified the violations and told the Mednanskys if they weren't corrected a new permit wouldn't be issued. This happened long before the Mednanskys' June 2 letter which they allege gave rise to the retaliatory motive. Defendants never made the conditions of compliance more difficult; if anything, the Mednanskys were given more leeway as time passed. For example, the June 19, 2009 letter eased the requirement of removing the vehicle from the yard altogether, and instead only required the Mednanskys to show it was operable. The same letter allowed the Mednanskys flexibility in complying with the "one out-building" requirement, which represents a softening of Defendants' position: they could show they were using the garage for storage of a vehicle, which would entitle them to keep either the shed or the outhouse.

The situation might be different if the letters had threatened to take away the cabin without regard to the submission of any paperwork, or if the Mednanskys had submitted

acceptable paperwork but the cabin was lost anyway.  But the complaint does not allege anything like this.  Rather, the complaint documents the Mednanskys' steadfast refusal to submit any paperwork, on the belief that they don't have to remedy any of the identified violations.  (*See, e.g.*, Opp'n to Mot. to Dismiss, ¶ 34 (arguing it was irrelevant how many opportunities Martin and Metz gave the Mednanskys to remedy the identified violations, because the identified violations were "trumped-up charges").  This is also borne out by Mr. Mednansky's June 8 email, in which he told Martin no written plan could be made until Martin gave him more information.  Although couched as a request for information, the message is primarily a series of rhetorical questions and objections about why the identified violations didn't need to be fixed.[1]

Although the complaint does not make this allegation, the Mednanskys in their opposition to the motion to dismiss allege the refusal to renew the permit was in retaliation for their exercise of their first amendment rights.  (Opp'n to Mot. to Dismiss, ¶ 30.)  They latch onto the January 13 letter as a promise to issue them a new permit, and allege Defendants reneged on this promise after the June 2 letter.  But the January 13 letter can't reasonably be interpreted as an unqualified promise to issue the Mednanskys' permit.  Instead, it's little more than a form letter telling all holders of expired permits[2] that the Forest Service was experiencing delays renewing the permits, and telling the permittees they wouldn't be penalized for delays that were the Forest Service's fault.  (*See* Mot. to Dismiss, Ex. 1 (". . . The Forest Service will not penalize permit holders for actions that the agency failed to perform in a timely manner . . . ."))  The letter doesn't tell the Mednanskys their permit was renewed, or promise that it was going to be renewed.  The Mednanskys therefore

---

[1] At the end of the email, Mr. Mednansky asks Martin to send him a copy of the "operation and maintenance plan."  This plan is provided for under the terms of the plan, but for purposes of correcting the identified violations, there is no reason to suppose it was necessary.

[2] The Mednanskys attach great significance to the salutation "Dear Recreation Residence Permit Holders," arguing this is an admission they were then in possession of a valid permit.  But the body of the letter addresses holders of <u>expired</u> permits whose new permits had not been issued: "Therefore, since the Forest [Service] has not executed permits or bills, we will treat holders as if the expired permit is still current . . . ."  (Mot. to Dismiss, Ex. 1.)

1   can't successfully amend their complaint to state a First Amendment retaliation claim based

2   on failure to renew their permit.

3        **B.    Due Process Claims**

4        The Mednanskys argue the Forest Service denied them due process when Metz told

5   them in his June 1 letter that they were not entitled to appeal the termination of their permit.

6   More generally, they appear to be alleging Defendants denied them due process by refusing

7   to hear them out, refusing to treat them fairly, and making arbitrary and clearly wrong

8   determinations.  *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 31 (1991) (discussing

9   "fundamental justice" as a due process requirement).  In this action they are not appealing

10  the Forest Service's refusal to grant them a new permit.

11       Ordinarily the Court will first determine whether the alleged facts make out a violation

12  of a constitutional right.  If the Court determines they do, it will ordinarily then proceed to the

13  question of whether the right was clearly established.  *Pearson*, 129 S.Ct. at  818.  Here,

14  however, the allegations are expansive and somewhat contradictory, while the second prong

15  of the test is more easily analyzed.  The Court therefore exercises its discretion to address

16  the second prong of the analysis without addressing the first.  *Id*.

17       Metz's statement, supported by a citation to 36 C.F.R. § 251.60(a)(2)(iii), is correct.

18  When a permit's term expires, which is what happened here, it terminates automatically

19  without agency action.  While the Mednanskys would be entitled under 36 C.F.R. § 251.60

20  to review if their permit were revoked or suspended, expiration of a permit is not subject to

21  administrative or judicial review.  There is no showing that denial of a new permit is subject

22  to review or that, if it was, Defendants interfered with the Mednanskys' exercise of that right.

23       As to the more generalized claims that Defendants arbitrarily and unjustly refused to

24  renew the Mednanskys' permit, Defendants are entitled to qualified immunity.  Metz and

25  Martin sent three letters to the Mednanskys identifying permit violations.  The Mednanskys'

26  communications show the letters were, at least in large part, based on actual conditions on

27  the Mednanskys' lot.  They do not dispute that a vehicle was parked next to the garage, that

28  two wall-like piles of stone had been erected on the lot, that a tree had a rope or chain

1   attached to it, or that in addition to the cabin and garage, they had two out-buildings on the
2   lot, an outhouse and a shed.  They also admit sand and gravel had been delivered to their
3   lot and was sitting there, waiting to be used in construction.  They do not deny the presence
4   of footings or something similar on the lot, but simply question why Defendants thought
5   footings were there as part of ongoing construction.

6          To the extent the Mednanskys are contending that the U.S. Government cannot
7   legitimately regulate their use of the lot, the Court rejects this argument.  *See, e.g., United*
8   *States v. Everist*, 2010 WL 1513839 (9th Cir., April 16, 2010) (summarily rejecting plaintiff's
9   argument that Forest Service lacked jurisdiction to regulate the use of his land within a
10  national forest); *see also* 16 U.S.C. § 551 (granting authority to the Secretary of Agriculture
11  to make rules and regulations to regulate the occupancy of national forests and preserve
12  them from destruction).  The Mednanskys have not alleged that such things as unauthorized
13  construction or maintenance of buildings, alteration of the landscape, and the like are
14  allowed under the permit.  Rather they argue Defendants' application of these requirements
15  to the situation at hand is simply wrong.

16         But the question is not whether Defendants were right or wrong in finding the
17  Mednanskys were in violation of the permit.  Rather, the question is whether they were
18  reasonable.  Even if they were mistaken, they are entitled to qualified immunity, provided
19  their actions were reasonable.  *Hunter*, 502 U.S. at 229 ("The qualified immunity standard
20  gives ample room for mistaken judgments . . . .")

21         The Mednanskys have failed to allege the terms of the expired permit, or to attach it
22  to any pleading.  Their conclusory allegations that Martin and Metz were clearly wrong when
23  they interpreted and applied its terms are therefore not entitled to any weight.  But even
24  assuming the old permit allowed permittees to maintain piles of building materials, multiple
25  out-buildings, chains around trees, and so on, the Mednanskys have not shown why
26  changing those requirements for purposes of issuing a new permit after the old permit
27  expired would violate due process.

28  / / /

The documentary evidence shows the Forest Service officials moderated their positions in response to the Mednanskys' representations and explanations, culminating in Martin's June 19 letter which represents the Forest Service's final, adjusted position.   That letter cites particular sections of the expired permit, indicating they were interpreting that agreement, and not simply making up requirements.  Had the Mednanskys truly believed Martin was making up new requirements "on the fly," they could have provided the cited sections themselves to show the letter's findings were baseless and the permit contained no such requirements.

When Metz and Martin determined the two rock piles organized into a fence shape constituted a wall, that determination was not unreasonable.  When they decided that ratcheting a tree into an upright position over a ten-plus-year period was not effective, safe, or appropriate, that decision was not unreasonable.  When they found that a disused outhouse, a garage not used to store a vehicle, and a shed were out-buildings, that was not unreasonable.  Their decision that accumulating piles of building materials amounted to commencement of construction activities was not unreasonable.  And their request for documentation to support Mr. Mednansky's position that the vehicle parked in his yard was operational was also not unreasonable.  Defendants' failure to cite these conditions earlier does not foreclose them from identifying them as violations later.

The Mednanskys' explanations, in turn, are not compelling.  Many of them are inconsistent, contradictory, irrelevant, or unreasonable. Mr. Mednansky's ratchet-and-crack tree-straightening method, for example, is not temporary as he claims; the chain had been in place for "some time" when they bought the cabin in 1999 and the straightening process is still underway.  His claim that a disused outhouse from the 1920s is a desirable feature is open to question, and his appeal to the its historical and monetary value is irrelevant. Obviously it was not built under the terms of his permit, as he claims, since he obtained the permit in 1999, over 70 years after the outhouse was built.  His description of the existing shed being "rebuilt" is inaccurate, since it is completely new, built to different specifications, and built on a different site.

No clearly established law required the issuance of a new permit under these circumstances.  Because reasonable officials in Defendants' position could have believed their decisions were reasonable, Defendants are entitled to qualified immunity from the due process claims.

In reaching this decision, the Court did not rely on pleadings outside the docket.  For this reason, the Court did not rely on the text of the expired permit (which neither party included as an exhibit), or on any representations the Mednanskys made in other cases.  In *United States v. Mednansky*, however, the United States has filed a motion for summary judgment (Case number 10cv1307, Docket number 6), and attached a copy of the signed permit agreement as Exhibit 1.

As Defendants have argued here, that permit authorizes only "one recreation residence and one out-building."  (Exhibit 1 at 1.)  The permit specifically withholds permission "to build or maintain any improvement not specifically named on the face of the permit . . . ."  (*Id*. at 2.)  This term appears to forbid allowing other structures to remain on the lot.  The permit also requires a Forest Service officer to prepare an operation and maintenance plan to address matters such as fire protection, removal of refuse, maintenance of facilities, and removal of dangerous trees.  (*Id*.)  The permit contemplates the enactment of "future regulations," with which the permittee promises to comply.  (*Id*.)  The permit also grants the officer considerable discretion, requiring the permittee to "maintain the improvements and premises to standards of repair, orderliness, neatness, sanitation, and safety acceptable to the authorized officer."  (*Id*. at 3.)

The Court's review of the permit confirms the June 19 letter's citations to it are essentially correct and valid.  The only questionable citation concerns the chain on the tree.  The cited portions of the permit forbid damaging or removing trees, and the letter shows Martin thought the chain would damage and eventually destroy the tree.  Even if Martin is wrong, however, the permit requires the permittee to inspect the site for dangerous trees, hanging limbs, and other potentially hazardous conditions, and after obtaining the officer's

/ / /

- 15 -                                                        09cv1478

1    permission, remove them.  (*Id.*)  The permit does not allow permittees to carry out their own

2    unauthorized methods for dealing with hazardous trees.

3          After reviewing the permit, the Court concludes Defendants' interpretation and

4    application of its terms were reasonable and the Mednanskys cannot amend their complaint

5    to save their due process claims.

6          **C.    Equal Protection Claims**

7          The motion to dismiss doesn't address the equal protection claims, probably because

8    they are so poorly pleaded.  Because they are so conclusory and lacking in detail they fall

9    far short of the pleading standard identified in *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)

10   and must be dismissed.  At this point, however, the Court cannot say that these claims

11   cannot possibly be saved by amendment, so they will be dismissed without prejudice.

12         **D.    Ninth Amendment Claims**

13         As noted, the Ninth Amendment claims are in fact mostly due process and equal

14   protection claims.  In any event, the Ninth Amendment has never been held to independently

15   secure a constitutional right for purposes of pursuing civil rights claims, and dismissal of civil

16   rights claims based on this amendment is proper.  *Strandberg v. City of Helena*, 791 F.2d

17   744, 748–49 (9th Cir. 1986).

18         **E.    Supervisory Liability**

19         The complaint makes only very general allegations against Defendants Moore, Ahuja,

20   Finley, and Grosz.  It contends they knew about Metz's and Martin's actions and were in

21   communication with Martin, but failed to intervene and stop the alleged violations.

22   (Complaint, 17:10–28, 19:3–9.)  This does not state a claim against any of these Defendants

23   under the *Iqbal* standard, so these claims will be dismissed as well.

24         **F.    Damages for Loss of Residence**

25         Although Defendants have not raised this issue and it is not necessary to this

26   decision, the Court's review of the permit, and of the pleadings in *United States v.*

27   *Mednansky* shows that the Mednanskys' cabin is not to be used as their primary, full-time

28   residence.  (Case number 10cv1307, Docket number 6, Ex. 1 at 1 ("[The cabin] **shall not**

1    **be used as a full-time residence to the exclusion of a home elsewhere.**")

2          The Mednanskys claim damages for "threats to seize and destroy [their] home and

3    worldly possessions," and their inability "to engage their normal mode of work and personal

4    affairs." (Complaint, 20:16–20.) Because the cabin was to have been used as a vacation

5    home and not as a primary residence, it is questionable whether they can obtain damages

6    for loss of their home and interruption of their day-to-day work and personal activities. If the

7    Mednanskys amend their complaint, they should address this.

8    **IV.   Conclusion and Order**

9          Because no claims have been adequately pleaded, the complaint is **DISMISSED** in

10   its entirety. As discussed above, the First Amendment, due process, and Ninth Amendment

11   claims are **DISMISSED WITHOUT LEAVE TO AMEND**. The equal protection claim,

12   including the claim as it may apply to Defendants Moore, Ahuja, Finley, and Grosz, is

13   **DISMISSED WITHOUT PREJUDICE**.

14         If the Plaintiffs believe they can amend their complaint to correct the deficiencies

15   identified in this order they must first seek leave to amend. They should do so by filing an

16   *ex parte* application seeking leave to amend, and attaching the proposed amended

17   complaint as an exhibit. The *ex parte* application must be filed no later than **21 calendar**

18   **days from the date this order is issued**.

19         If the Plaintiffs wish to bring equal protection claims, they must plead facts showing

20   they were treated worse than other similarly-situated permittees for no rational reason. *See*

21   *Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, ___, 128 S.Ct. 2146, 2153 (2008). Showing

22   they were treated worse than dissimilarly-situated permittees, or permittees in general, will

23   not suffice. Likewise if the Plaintiffs wish to bring claims against supervisors, they must

24   plead facts showing the supervisors' involvement in the alleged wrongs. If the Plaintiffs wish

25   to add any related claims or proceed under new theories, they must adequately plead facts

26   / / /

27   / / /

28   / / /

1   to support those claims or theories.  If Plaintiffs amend their complaint, they should

2   anticipate that Defendants will raise qualified immunity as a defense and plead accordingly.

3

4       **IT IS SO ORDERED**.

5   DATED:  August 26, 2010

6

7       **HONORABLE LARRY ALAN BURNS**
    United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28